UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| JUDY STAIB | \* | |
|     Plaintiff, | \* | CIVIL ACTION: 3:02CV1157(JCH) |
| | \* | |
| v. | \* | |
| | \* | |
| DANBURY BOARD OF EDUCATION, | \* | JUNE 11, 2004 |
|     Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION FOR ENTRY OF CONSENT JUDGMENT**

Plaintiff Judy Staib hereby requests that the court enforce the terms of a settlement agreement previously agreed to by the parties to this action. The undersigned attorney for the plaintiff represents:

I.   **FACTS**

This is a complaint brought under the Age Discrimination Employment Act, 29 U.S.C. §621 et. seq. and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. alleging that the plaintiff was discriminated against in her employment because of her age, race and national origin, and that she was retaliated against for having filed complaints at the Connecticut Commission on Human Rights and Opportunities and Equal Employment Opportunity Commission.

On June 20, 2003, Judge Hall held a status conference in this matter. Judge Hall referred the case to Magistrate Judge Fitzsimmons for a settlement conference.

On August 4, 2003, Judge Fitzsimmons presided over a settlement conference. Attorney Michael P. McKeon, for the defendant, agreed to recommend that the defendant pay within a certain range. The details are confidential because they occurred in the context of a settlement conference. In reliance on the defendant's good faith, the plaintiff canceled depositions of defendant's key decisionmakers, which were scheduled for August 7, 2003.

Mr. McKeon did not thereafter tell the plaintiff how much money defendant was willing to pay, despite repeated phone calls to him. On October 3, 2003, Attorney Lynn M. Mahoney called Judge Fitzsimmons' chambers to enlist the participation of the court in concluding the settlement. According to one of Judge Fitzsimmons' clerks, Mr. McKeon was contacted. Still there was no response from the defendant, so on October 31, 2003 the plaintiff noticed the deposition of the defendant's former superintendent of schools, a key decision-maker. Exhibit A.

On December 2, 2003, Mr. McKeon called Ms. Mahoney and informed her that he had not yet ascertained how much money his clients would be willing to pay. (Mr. McKeon represents both the named board of education and an insurance company.) On December 5, 2003, Mr. McKeon informed Ms. Mahoney that he was making progress with his client, and Ms. Mahoney agreed to postpone the deposition until December 15, 2003.

On December 11, 2003, defendant's counsel made an offer, which was rejected by the plaintiff. The offer was a sharp departure from the representations that were made during the settlement conference with Magistrate Judge Fitzsimmons. But

because substantive negotiations had resumed, Ms. Mahoney agreed to postpone the deposition until December 22, 2003. See Exhibit B. That deposition was also postponed because the parties appeared to be negotiating in good faith, and both sides were interested in avoiding the time and expense of the deposition if the case were to settle.

Between December 12, 2003 and January 20, 2004, plaintiff's counsel and defendant's counsel exchanged a number of offers and demands. On January 20, 2004, Attorney McKeon and the undersigned, Attorney Leon M. Rosenblatt, agreed to settle the case for $32,551.80. That agreement was memorialized by the undersigned's letter to defendant's counsel and attached here as Exhibit C.

Attorney McKeon wanted to draft a settlement agreement. He apologized for the delay in doing so on February 13, 2004. Exhibit D. He finally drafted an agreement on February 18, 2004. Exhibit E. That agreement was not acceptable because the money was to be paid entirely to plaintiff's attorney on a 1099 form, as opposed to backpay on a W-2 form. This was unacceptable because the plaintiff needed the money to be paid as regular wages so it would increase her average salary, which is the basis for determining pension benefits.

The undersigned called Mr. McKeon a number of times between February 18, 2004 and March 1, 2004 to inform him the settlement had to recite that the payment was regular salary. On March 1, 2004, after hearing no response, the undersigned drafted a revised settlement agreement acceptable to the plaintiff. The undersigned specifically flagged the language in question. Exhibit F.

On March 23, 2004 Attorney McKeon informed the undersigned by voice mail message that the defendant had accepted the terms proposed in the March 1, 2004 draft. The message was memorialized by a letter from the undersigned. Exhibit G. This was the second time the parties reached a settlement agreement, the first time being on January 20, 2004.

Attorney McKeon promised on March 23, 2004 to have the insurance company's check by the end of the week; that he would revise his own draft of an agreement to include the plaintiff's demand that the settlement money be deemed wages for all purposes; that a new draft of the agreement would be ready by March 24, 2004; and that the agreement would be executed by his clients by the end of the week and the money would be paid immediately. Exhibit G.

On April 2, 2004, Mr. McKeon agreed in writing to the terms demanded by the plaintiff and forwarded a copy of this proposed settlement agreement. Exhibit H.

On April 14, 2004, the undersigned spoke with Attorney McKeon on the phone and confirmed the April 2, 2004 agreement was accepted. As proposed in Attorney McKeon's April 12, 2004 letter, he agreed to prepare two original agreements for formal execution.

Between approximately April 18, 2004 and May 13, 2004 the undersigned and his secretary, Mary Brown, made several calls to Attorney McKeon to find out why the agreement had not been executed and the money sent. On May 13, 2004, the defendant repudiated the agreement. Exhibit I.

## II.    ARGUMENT

"An agreement to end a lawsuit is construed according to contract principles. The meeting of minds is an issue to be determined by examination of the totality of the circumstances." <u>United States of America v. Sforza</u>, 326 F. 3d 107 (2d Cir. 2003) (enforcing settlement agreement).

There are two kinds of judgments that can arise from a settlement. A "consent judgment" occurs "when all of the relief to be provided by the judgment and all of the wording to effectuate that relief is agreed to by the parties." A "settlement judgment" occurs when the parties have agreed on the components of a judgment but have not agreed on all of the details or the wording of the judgment. <u>Janus Films, Inc. v. Miller, et al.</u>, 801 F.2d 578, 582 (2d Cir. 1986) (enforcing settlement agreement).

> Agreements that end lawsuits are contracts, sometimes enforceable in a subsequent suit, but in many situations enforceable by entry of a judgment in the original suit.... Due regard for the proper use of judicial resources requires that a trial judge proceed with entry of a settlement judgment after affording the parties an opportunity to be heard as to the precise content and wording of the judgment, rather than resume the trial and precipitate an additional lawsuit for breach of a settlement agreement.

<u>Janus</u>, 801 F.2d at 583.

> "A settlement is a contract, and once entered into is binding and conclusive." *Janneh v. GAF Corp., 887 F.2d 432, 436 (2d Cir. 1989),* overruled on other grounds by *Digital Equipment Corp. v. Desktop Direct, Inc., 511 U.S. 863, 128 L. Ed. 2d 842, 114 S. Ct. 1992 (1994)....* The interpretation and enforcement of contractual obligations between private parties is controlled by principles of state law. See *Concerned Tenants Ass'n of Father Panik Village v. Pierce, 685 F. Supp. 316, 323 (D. Conn. 1988);* see also *Ciaramella v. Reader's Digest Association, Inc., 131 F.3d 320, 322 (2d Cir. 1997)* (concluding that general principles of contract interpretation regarding parties' intent applied to determination of whether parties reached settlement of claims).

> "A trial court has the inherent power to enforce summarily a settlement agreement as a matter of law when the terms of the agreement are clear and unambiguous." *Audubon Parking Assocs. L.P. v. Barclay & Stubbs, Inc.*, 225 Conn. 804, 811, 626 A.2d 729 (1993); see also *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974) ("A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case pending before it.") (citations omitted).
>
> Summary enforcement is not only essential to the efficient use of judicial resources, but also preserves the integrity of settlement as a meaningful way to resolve legal disputes. When parties agree to settle a case, they are effectively contracting for the right to avoid a trial. The asserted right not to go to trial can appropriately be based on a contract between the parties. We hold that a trial court may summarily enforce a settlement agreement within the framework of the original lawsuit as a matter of law when the parties do not dispute the terms of the agreement.

<u>Pultney Arms, LLC. v. Shaw Industries, Inc.</u>, 2002 U. S. Dist. LEXIS 17678 (Arterton, J. September 6, 2002) (citing <u>Audubon</u>, *225 Conn. at 812*) (enforcing settlement agreement) (copy attached).

The first agreement reached by the parties was January 20, 2004. That would have been enough to support a "settlement judgment." See <u>Janus Films</u>, above. On that date Attorney McKeon and the undersigned settled the case, but the details had not been fully discussed and committed to paper. The agreement made on March 23, 2004 would certainly support a "settlement judgment" and probably would support a "consent judgment." The defendant had yet to draft the agreement, but the components, if not the wording, had been agreed upon. <u>Id.</u> By April 14, 2004 the defendant had produced a written agreement which was accepted without qualification by the plaintiff. By this time, there can be no doubt that "all of the relief. . . and all of the wording to effectuate that relief" had been agreed to by both sides. The agreement had been drafted by the defendant in writing, and the plaintiff had said, "I accept." A contract was formed. The

6

defendants' reneging on the agreement a month later, and its refusal to pay the money, is a flagrant breach of a "binding and conclusive" agreement. See <u>Pultney Arms</u>, above.

It is respectfully submitted that the court should exercise its "inherent power" to enforce the agreement. See <u>Janus Films</u> and <u>Pultney</u> Arms, above. The plaintiff has been waiting for ten months (since the settlement conference on August 4, 2003) to put this case behind her. She has been incredibly patient while the defendant delayed and waffled and ultimately abrogated a contract. But a deal is a deal, and the court should enter judgment on the terms specified in Exhibit H, the agreement drafted by the defendant.

THE PLAINTIFF,

By: *[signature]*
Leon M. Rosenblatt (ct00284)
Law Offices of Leon M. Rosenblatt
10 North Main Street
West Hartford, CT 06107
(860) 523-8066

## **CERTIFICATION**

This is to certify that a copy of the foregoing was mailed; postage prepaid, on this the 11th of June 2004, to:

Attorney Michael P. McKeon
Sullivan, Schoen, Campane & Connon, LLC
646 Prospect Ave.
Hartford, CT 06105-4286

_____
Leon M. Rosenblatt

Pultney Arms LLC v. Shaw Industries, Inc.
3:00cv2052(JBA)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

2002 U.S. Dist. LEXIS 17678

September 6, 2002, Decided

DISPOSITION: [*1] Plaintiff's motion to enforce settlement agreement and enter settlement judgment granted; Defendant's cross-motion to enforce settlement agreement and for entry of settlement judgment denied.

CASE SUMMARY:

PROCEDURAL POSTURE: After a settlement agreement was reached between plaintiff lessor and defendant guarantor in a diversity breach of contract action, a dispute arose concerning terms of the agreement. The parties filed cross-motions for enforcement of the settlement, each requesting that the court summarily enforce different terms.

OVERVIEW: The lessor leased real property to a tenant, the parent corporation of which guaranteed the lease. When the guarantor purchased the tenant and parent, it guaranteed to the lessor full payment of rent and performance of the lease. When the parent's successor filed Chapter 11 bankruptcy, it rejected the lease and discontinued paying rent. The parties' settlement, placed on record in the suit, provided for a cash payment by the guarantor in return for a stipulation of dismissal with prejudice, broad mutual releases and the withdrawal of the lessor's bankruptcy claim. The lessor documented the latter three undertakings to the guarantor's satisfaction. The guarantor, however, insisted upon written approval of the lessor's lender as a condition to its payment under the settlement. It also had proffered a written settlement agreement containing additional terms unacceptable to the lessor. The district court found that the settlement was enforceable in the form shown in the record. The lessor's lender was not a party to the suit, but a privy, and the stipulated dismissal would be res judicata as to the lender. Lender approval was a matter of concern only to the lessor and the lender.

OUTCOME: The district court granted the lessor's motion to enforce settlement agreement and enter settlement judgment and denied the guarantor's cross-motion to enforce settlement agreement and for entry of settlement judgment.

LexisNexis (TM) HEADNOTES - Core Concepts:

COUNSEL: For SHAW INDUS, INC, defendant: George D. Royster, Jr., Thomas J. Finn, Andrew D. Moore, Halloran & Sage, Hartford, CT.

For TRIMAR EQUITIES, LLC, plaintiff: Stephen P. Wright, Eric R. Gaynor, Harlow, Adams & Friedman, P.C., Milford, CT.

JUDGES: Janet Bond Arterton, United States District Judge.

OPINIONBY: Janet Bond Arterton

OPINION:
Ruling on Cross-Motions to Enforce Settlement [Docs. # # 33 & 37]

After a settlement agreement was reached between the parties in this diversity breach of contract action, a dispute arose concerning terms of the agreement. The parties have filed cross-motions for enforcement of the settlement, each requesting that the Court summarily enforce different terms. For the reasons set out below, Plaintiff's motion is granted and Defendant's motion is denied.

I. Background

Pultney Arms / Trimar Equities ("Pultney") n1 leased 2115 Dixwell Avenue ("the property") to New York Carpet World of New England ("New England"), with the lease[*2] guaranteed by New England's parent company, New York Carpet World, Inc. ("Inc."). Shaw Industries ("Shaw") subsequently purchased both New England and Inc., and as part of that purchase, Shaw guaranteed Pultney full payment of rent and the performance of all terms and conditions of the lease. In 2000, Inc.'s successor company, Maxim, filed for Chapter 11 protection in Georgia and rejected the lease, thereafter abandoning the property and failing to pay any rent. Pultney commenced this action against Shaw, claiming that under Shaw's guarantee of the lease, Shaw

is liable to Pultney for unpaid rent and associated collection costs.

------------------Footnotes------------------

n1 Although suit was commenced in 2000 with "Pultney Arms LLC" as plaintiff, a subsequent filing [Doc. # 12] by plaintiff disclosed that the real party in interest has, since 1997, been Trimar Equities LLC. For clarity, the Court refers to Pultney / Trimar as "Pultney."

------------------End Footnotes------------------

The parties were referred to Magistrate Judge Joan Glazer Margolis for a settlement conference, and after three meetings, [*3] a settlement was put on the record. The transcript of the proceeding reflects the following terms: (1) Shaw was to pay Pultney $560,000 in thirty days; (2) Pultney would file a dismissal of this lawsuit with prejudice; (3) the parties would exchange mutual releases, with plaintiff providing releases from both Pultney Arms LLC and Trimar Equities LLC; and (4) Pultney would file a withdrawal of the claim it had filed in the bankruptcy action pending in Georgia.

Pultney transmitted to Shaw's counsel a draft notice of dismissal with prejudice, a draft withdrawal of proof of claim, and draft mutual releases, and in response, Shaw sent a proposed multi-page settlement agreement. Pultney refused to sign this settlement agreement, arguing that the agreement set out on the record is the entirety of the agreement between the parties, and that "the proposed Settlement Agreement contained other terms and conditions not discussed and such an agreement in lieu of the agreement put on the record on November 16, 2001 was unacceptable." [Doc. # 34] at 3-4. Pultney thereafter moved [Doc. # 33] to enforce the agreement with only those terms put on the record before the Magistrate Judge; that is, [*4] with only dismissal of this action with prejudice, withdrawal of the bankruptcy claim, and mutual releases.

Shaw opposes Pultney's motion and filed its own motion [Doc. # 37] to summarily n2 enforce the settlement agreement, albeit with an additional proviso. Shaw claims that "on several occasions, counsel for plaintiff . . . represented to both the Court and Shaw's attorneys that Plaintiff needed approval from its lender, G.E. Capital, to settle the above-captioned case" and that on the date the settlement mediated by the Magistrate Judge was concluded, "Plaintiff's attorneys represented to both the Court and Shaw's attorneys that Plaintiff had obtained lender approval" to settle for $560,000. [Doc. # 37] at 1. Shaw contends that it relied on these representations, "thereby making Plaintiff's representations regarding lender approval a material term in the settlement agreement," id. at 2, and that Pultney has refused to confirm these representations in writing. Further, Shaw alleges that in a subsequent telephone conference with the Magistrate Judge, "Plaintiff's attorneys stated to both the Court and Shaw's attorneys that, contrary to previous representations[], Plaintiff[*5] did not have lender approval and that it would not obtain lender approval." Id. Shaw asks the Court to enter a settlement judgment "requiring Plaintiff to obtain either: (1) written authority from its lender, G.E. Capital, that Plaintiff may settle the case for $560,000; or (2) written acknowledgment from G.E. Capital that its approval was not (and is not) a condition precedent to Plaintiff's settlement of the case . . . ." [Doc. # 37] at 3.

------------------Footnotes------------------

n2 Shaw's motion requests entry of settlement judgment, and is marked only "Oral Argument Requested"; no request is made for an evidentiary hearing and no indication is present that Shaw believes testimony is required.

------------------End Footnotes------------------

In opposition to Shaw's motion, Pultney represents that any comments regarding lender approval "revolved around Plaintiff's need to consult with its lender because of the problems Defendant's breach of the guarantee was causing between Plaintiff and its lender." [Doc. # 39] at 3 (emphasis omitted). In an attached affidavit, Pultney's attorney avers[*6] that any discussions between G.E. Capital and Pultney "were Plaintiff's concern and for Plaintiff's benefit," Gaynor Aff. P 4 [Doc. # 39 Ex. A], and that neither Pultney nor its attorney represented that any such written consent was necessary, id. P 6. Pultney then identifies several areas of the written settlement agreement that it found problematic, including an indemnification provision that includes the payment of

attorney's fees, a representation that neither party dealt with a broker, and a requirement that if any litigation arises from the settlement agreement, the losing party will pay the attorney's fees of the prevailing party.

II. Analysis

"A settlement is a contract, and once entered into is binding and conclusive." *Janneh v. GAF Corp.*, 887 F.2d 432, 436 (2d Cir. 1989), overruled on other grounds by *Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 128 L. Ed. 2d 842, 114 S. Ct. 1992 (1994); accord *Janus Films, Inc. v. Miller*, 801 F.2d 578, 583 (2d Cir. 1986) ("Agreements that end lawsuits are contracts, sometimes enforceable in a subsequent suit, but in many situations enforceable by entry of a[*7] judgment in the original suit."). The interpretation and enforcement of contractual obligations between private parties is controlled by principles of state law. See *Concerned Tenants Ass'n of Father Panik Village v. Pierce*, 685 F. Supp. 316, 323 (D. Conn. 1988); see also *Ciaramella v. Reader's Digest Association, Inc.*, 131 F.3d 320, 322 (2d Cir. 1997) (concluding that general principles of contract interpretation regarding parties' intent applied to determination of whether parties reached settlement of claims).

"A trial court has the inherent power to enforce summarily a settlement agreement as a matter of law when the terms of the agreement are clear and unambiguous." *Audubon Parking Assocs. L.P. v. Barclay & Stubbs, Inc.*, 225 Conn. 804, 811, 626 A.2d 729 (1993); see also *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974) ("A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case pending before it.") (citations omitted).

Summary enforcement is not only essential to the efficient use of judicial resources, but also preserves the integrity[*8] of settlement as a meaningful way to resolve legal disputes. When parties agree to settle a case, they are effectively contracting for the right to avoid a trial. The asserted right not to go to trial can appropriately be based on a contract between the parties. We hold that a trial court may summarily enforce a settlement agreement within the framework of the original lawsuit as a matter of law when the parties do not dispute the terms of the agreement.

*Audubon*, 225 Conn. at 812 (internal quotations and citations omitted).

The record reflects and the parties agree (as evidenced by their cross-motions for summary enforcement) that a binding settlement has been reached, and that the Court has authority to enter judgment pursuant to that settlement. The only question presented by these motions is whether judgment should be entered strictly in accordance with the agreement set out on the record before the Magistrate Judge, as Pultney requests, or whether judgment should be entered with a proviso regarding lender approval, as Shaw requests.

G.E. Capital is not a party to this lawsuit; the only parties of record are Pultney and Shaw. With certain exceptions not[*9] applicable in this straightforward contract suit based on state law, the Federal Rules of Civil Procedure give the parties to a lawsuit the authority to settle the action and stipulate to the dismissal of the suit with prejudice. Fed. R. Civ. P. 41(a)(1); Wright & Miller, Federal Practice & Procedure: Civil 2d § 2362 at 249-250 ("Of course, a case, with very few exceptions, may be dismissed at any time by stipulation of all the parties."). A dismissal with prejudice, such as that provided for in the terms of the settlement stated on the record before the Magistrate Judge, "is subject to the usual rules of res judicata and is effective not only on the immediate parties but also on their privies." Id. § 2367 at 319-320 (citing, inter alia, *Astron Indus. Associates, Inc. v. Chrysler Motors Corp.*, 405 F.2d 958, 960-961 (5th Cir. 1968) (stipulation of dismissal with prejudice constitutes a final judgment on the merits which bars a later suit on the same cause of action by anyone in privity with the parties to the original suit)); accord *Horton v. Trans World Airlines Corp.*, 169 F.R.D. 11, 16 (E.D.N.Y. 1996.).

In the settlement reached on the record[*10] before the Magistrate Judge, the parties agreed to dismiss this suit with prejudice, and Pultney has provided a stipulation to that effect which Shaw agrees is acceptable in form. See Letter from Thomas Finn (attorney for Shaw) to Eric Gaynor (attorney for Pultney) of December 13, 2001 ("The Notice of Dismissal that you forwarded to me is fine as is and if you would like me to execute the faxed copy, I will do so and overnight it to you for filing with the court.") (attached as an exhibit to [Doc. # 34]). Additionally, the settlement on the record provides for mutual releases, and the releases proposed by Pultney are sufficiently broad to preclude any subsequent lawsuit regarding unpaid rents from Shaw:

[Releasor] does remise and forever discharge the said Releasee of and from all debts, obligations, reckonings, promises, covenants, agreements, contracts, endorsements, bonds, specialties, controversies, suits, actions, causes of actions, trespasses, variances, judgments, extents, executions, damages, claims or demands, in law or in equity, which against the said Releasee, the Releasor ever had, now has or hereafter can, shall, or may have, for, upon, or by reason of[*11]

any matter, cause or thing whatsoever, from the beginning of the world until the date of theses [sic] presents.

Draft Release provided by Pultney (attached as an exhibit to [Doc. # 33]). Finally, Pultney has tendered a withdrawal of the proof of claim in the Georgia bankruptcy action, and Shaw has not objected to the form of the withdrawal.

Given the stipulation of dismissal with prejudice, the broad mutual releases and the withdrawal of the bankruptcy claim, the Court discerns no consequence of any purported lack of approval of non-party G.E. Capital. On this record, with G.E. Capital not a party to this action and not having been shown to have any separate, legally actionable interest in the outcome of the parties' dispute, lender approval or the lack thereof is an internal dispute of concern only as between Pultney and G.E. Capital. Pultney's representations in its motion confirm this, see Gaynor Aff. PP 4 & 6 [Doc. # 39 Ex. A], and based on these representations, judgment will be rendered in accordance with the terms set out on the record before the Magistrate Judge. If, despite the dismissal with prejudice (which, as noted above, binds those in privity with[*12] Pultney) and the broad mutual releases, either Pultney or G.E. Capital attempts to use a lack of lender approval to frustrate the clear terms of the settlement and deprive Shaw of the benefit of its bargain, relief is available under *Fed. R. Civ. P. 60(b)(3)*, which provides for relief from judgment in cases of "fraud[,] misrepresentation, or other misconduct of an adverse party."

III. Conclusion

For the reasons set out above, Plaintiff's Motion to Enforce Settlement Agreement and Enter Settlement Judgment [Doc. # 33] is GRANTED and Defendant's Cross-Motion to Enforce Settlement Agreement and for Entry of Settlement Judgment [Doc. # 37] is DENIED.

Inasmuch as the terms of the settlement agreement provided that payment was to be made in thirty days, the judgment will include prejudgment interest at the federal post-judgment rate from January 18, 2002. n3 Judgment will enter accordingly.

------------------Footnotes------------------

n3 Although the agreement was placed on the record on November 16, 2001, plaintiff has requested prejudgment interest only from January 18, 2002. [Doc. # 39] at 10.

Plaintiff's request for attorney's fees was raised for the first time in reply, and is thus not part of its motion. See D. Conn. L. Civ. R. 9(g) (reply briefs "must be strictly confined to a discussion of matters raised by the responsive brief"); *Knipe v. Skinner, 999 F.2d 708, 711 (2d Cir. 1993)* ("Arguments may not be made for the first time in a reply brief.").

------------------End Footnotes------------------

[*13]

IT IS SO ORDERED.

/s/

Janet Bond Arterton

United States District Judge

Dated at New Haven, Connecticut, this 6th day of September, 2002.